## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| ANGELA C. CURRAN, | CASE NO. 1:20-CV-02696 |
| Plaintiff, | DISTRICT JUDGE JAMES S. GWIN |
| vs. | |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | MAGISTRATE JUDGE AMANDA M. KNAPP |
| Defendant. | **REPORT AND RECOMMENDATION** |

Plaintiff Angela C. Curran ("Plaintiff" or "Ms. Curran") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI").  (ECF Doc. 5.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the Court **VACATE and REMAND** the Commissioner's decision for further analysis of Ms. Curran's hearing loss and any work-related limitations caused by that impairment.

1

# I.  Procedural History

## A.    Prior Application

Ms. Curran filed a prior application for SSI on March 21, 2011 and received a fully

favorable decision on that application on April 2, 2012.  (Tr. 70-78, 206.)  In the April 2, 2012,

decision, the ALJ concluded that Ms. Curran was disabled as of December 31, 2006, finding that

Ms. Curran had severe impairments of seizure disorder, post-traumatic stress disorder (PTSD),

mood disorder, hearing loss, chondromalacia of left patella, joint strain, and status post remote

fracture of left clavicle, and that her seizure disorder met Listing 11.02 (convulsive epilepsy).

(Tr. 76-77.)  The ALJ recommended a continuing disability review ("CDR") in twenty-four

months.  (Tr. 77.)  Although not entirely clear from the record, it appears that her benefits were

terminated pursuant to a CDR in or around January 2015.  (Tr. 81, 85, 206.)   She subsequently

filed the SSI application which is the subject of this appeal.

## B.    Current Application

Ms. Curran filed the SSI application that is the subject of this appeal on August 10, 2018.

(Tr. 19, 79, 80, 178-83.)  She asserted a disability onset date of August 1, 1997 (Tr. 19, 80, 178),

and alleged that she was disabled due to bilateral hearing loss, seizures, PTSD, anxiety, and legal

blindness in left eye (Tr. 80-81, 111, 117, 197).  Her applications were denied at the initial level

(Tr. 111-13) and upon reconsideration (Tr. 117-18).  She requested a hearing (Tr. 123-25), which

was held before an Administrative Law Judge ("ALJ") on December 6, 2019 (Tr. 35-69).

On January 28, 2020, the ALJ issued an unfavorable decision, finding Ms. Curran had not

been under a disability within the meaning of the Social Security Act from August 10, 2018, the

date the application was filed.  (Tr. 16-34.)  Ms. Curran requested review of the ALJ decision by

the Appeals Council.[1]  (Tr. 175-77.)   On September 30, 2020, the Appeals Council denied her

request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-7.)

## II. Evidence

Although Ms. Curran has severe physical and mental impairments that were identified by

the ALJ (Tr. 22), she only challenges the ALJ's decision relative to findings as to her non-severe

hearing loss.  (ECF Doc. 18; ECF Doc. 23.)  The evidence summarized herein is accordingly

focused on evidence pertaining to her hearing loss.

**A.      Personal, Educational, and Vocational Evidence**

Ms. Curran was born in 1981.  (Tr. 26, 178.)  She lived with the father of her children and

his friend.  (Tr. 43.)  She had four minor children who were living with a family member at the

time of the hearing, while she recovered from a knee injury.  (Tr. 43-44.)  She had a GED, and

her past employment included babysitting and working at fast food restaurants.  (Tr. 45-46, 197,

209.)  She had not been employed since 2006. (*Id.*)

**B.      Medical Evidence**

**1.      Treatment History**

Ms. Curran's medical records reflect a past medical history significant for various

medical conditions that include tuberous sclerosis, questionable seizures involving the left side,

epilepsy, history of hearing loss at birth, "ear drum repair tubes in her ears," and a history of left-

sided hemisensory loss secondary to a stroke that occurred at the age of sixteen.  (Tr. 279, 286.)

---

[1] Ms. Curran asserts that she submitted a brief to the Appeals Council that is not contained in the transcript before
this Court, and was not exhibited by the Appeals Council.  (ECF Doc. 18 p. 4, n. 2.)  She attaches a facsimile cover
sheet which she asserts verifies submission of the brief.  *(Id.*; ECF Doc. 19.)   However, the destination number
shown on the fax cover sheet does not match the fax number in the body of the correspondence.  (ECF Doc. 19-1 p.
1.)  Thus, it may be that the brief was sent to an incorrect fax number.  In any event, the undersigned concludes that
consideration of the brief would not alter the recommendation in this matter.

On January 11, 2011, Ms. Curran saw John Brace, D.O., at an Ear, Nose & Throat Clinic in Ashtabula and had audiology testing performed by Joan Kerosky, M.A., C.C.C./Audiology. (Tr. 752, 756, 759.)  Dr. Brace noted decreased hearing and ringing in both ears.  (Tr. 752.)  The audiogram results for the right ear showed an SRT (speech recognition threshold) of 40 and 90% discrimination at an MCL (most comfortable level) of 70.  (Tr. 759.)  In the left ear, there was an SRT of 45 and 70% discrimination at an MCL of 70.  (*Id*.)  Ms. Kerosky noted "recheck" in the comments section.  (*Id*.)

On February 22, 2011, Ms. Curran saw Dr. Brace and had another audiogram performed by Ms. Kerosky.  (Tr. 752, 755, 761.)  Dr. Brace noted hearing loss in both ears and the results of the testing for both ears showed an SRT of 45 and 90% discrimination at an MCL of 65.  (*Id*.)  Ms. Kerosky noted "Pure tones not in agreement with SRTs" in the comments section.  (Tr. 761.)

On April 6, 2012, Ms. Curran saw Preetha Muthusamy, M.D., a Neurology and Neuromuscular Specialist with the Cleveland Clinic, for a neurological reevaluation after previously seeing Dr. Muthusamy for diagnosis of epilepsy in November 2011.  (Tr. 286-87.)  Ms. Curran's speech was normal, and she denied ENT problems.  (Tr. 287.) However, cranial nerve testing revealed decreased hearing in both ears.  (*Id*.)  Dr. Muthusamy provided a treatment plan to address Ms. Curran's complaints of seizures and vertigo.  (*Id*.)  There was no specific assessment or treatment plan relative to Ms. Curran's noted hearing issues.  (*Id*.)

Ms. Curran saw Dr. Muthusamy for a follow up on June 15, 2012.  (Tr. 279-80.)  During the visit, cranial nerve testing continued to reveal decreased hearing in both ears.  (Tr. 280.) Ms. Curran's speech remained normal.  (*Id*.)  Dr. Muthusamy again did not make any specific assessment or plan relative to Ms. Curran's hearing loss.  (*Id*.)

4

On October 8, 2017, Ms. Curran presented to the Ashtabula County Medical Center's emergency room with complaints of sinus congestion and ear pain that had been occurring for two days.  (Tr. 378.)  She denied ear drainage or hearing loss, and no decreased hearing was noted on examination.  (Tr. 378, 380.)  She was diagnosed with acute sinusitis.  (Tr. 381.)

On August 17, 2018, Ms. Curran returned to the Ear, Nose & Throat Clinic to see Dr. Brace, and an audiogram was performed again by Ms. Kerosky.  (Tr. 751, 753, 757.)  Dr. Brace noted hearing loss in both ears.  (Tr. 753.)  The audiogram results for the right ear showed a SRT of 65 and 80% discrimination at an MCL of 85.  (Tr. 757.)  In the left ear, there was a SRT of 65 and 80% discrimination at an MCL of 80.  (*Id*.)

Ms. Curran was prescribed hearing aids in early October 2018.  (Tr. 1186.)  On October 19, 2018, Ms. Curran had further audiology testing at Community Action conducted by Cindy Lanning, M.A.  (Tr. 1198.)  There is a portion of the record that is not legible, but it appears that Ms. Curran's SRT was 25 and her word discrimination percentage was 92%.  (*Id*.)  Audiologist Lanning noted: "aided thresholds good though upped 4K 3dB to better assist re clarity" and "aided SRT and word understanding good as well."  (*Id*.)

During an April 16, 2019 consultation with Jessica Fesler, M.D. at the Cleveland Clinic for possible seizures, Ms. Curran relayed that she was born deaf and had hearing aids, but took them out during the visit.  (Tr. 1599.)  Under seizure risk factors, Dr. Fesler noted that there was no history of developmental delay, but also noted that Ms. Curran had gone to "crippled children's society for hearing impairment" and had an IEP.  (Tr. 1597.)   On cranial nerve examination, as to cranial nerve VIII, Dr. Fesler noted that Ms. Curran had "normal hearing to speech (without hearing aid in for the visit)."  (Tr. 1600.)  As part of Dr. Fesler's treatment plan, Ms. Curran was admitted for epilepsy monitoring.  (Tr. 1601, 1623.)  During that admission, Ms.

Curran reported no changes in her hearing or vision.  (Tr. 1626.)   On cranial nerve examination for cranial nerve VIII, it was noted that "deafness in left ear" was reported.  (Tr. 1627.)

On May 31, 2019, Ms. Curran saw Cheryl Katavich, PA-C at Ashtabula County Medical Center to establish a new primary care physician.  (Tr. 1782.)  She complained of having bilateral ear pain for two weeks.  (*Id*.)  Ms. Curran rated her pain a 9/10 and reported wearing hearing aids but not having them in that day.  (*Id*.)  She reported having ear problems since she was born and had ear surgery when she was sixteen years old to repair an ear drum.  (*Id*.) Examination of Ms. Curran's ears was normal.  (Tr. 1784.)  Ms. Curran's primary diagnosis was TMJ dysfunction.  (*Id*.)

### 2.    Opinion Evidence - State Agency Reviewing Medical Consultants

An initial review of Ms. Curran's claim was conducted by state agency reviewing psychological consultant Joseph Edwards, Ph.D on October 17, 2018, and by state agency reviewing medical consultant William Bolz, M.D. on November 18, 2018.  (Tr. 85-91.)  As part of the initial review, hearing loss was noted to be one of Ms. Curran's alleged impairments and the August 17, 2018 audiology results were noted.  (Tr. 80, 85-86.)  However, hearing loss was not found to be a medically determinable impairment.  (Tr. 85-86 (finding the following medically determinable impairments: loss of central visual acuity, epilepsy, depressive, bipolar and related disorders, and anxiety and obsessive-compulsive disorders).)  In his physical RFC assessment, Dr. Bolz found that Ms. Curran could never climb ladders, ropes, or scaffolds, and would need to avoid all exposure to hazards.  (Tr. 89.)  Dr. Bolz explained that the postural limitation was due to Ms. Curran's history of seizures and the environmental limitation was due to Ms. Curran's history of seizures and eye problems.  (Tr. 88-89.)  No physical or mental RFC limitations were attributed to Ms. Curran's alleged hearing loss.  (Tr. 88-89, 89-91.)

Ms. Curran's claim was reviewed at the reconsideration level by state agency reviewing psychological consultant Cynthia Waggoner, Psy.D. on February 20, 2019, and by state agency reviewing medical consultant Lynne Torello, M.D. on February 24, 2019.  (Tr. 97-108.)  Dr. Torello noted Ms. Curran's allegations regarding hearing loss, but like Dr. Bolz on initial review, did not find Ms. Curran's alleged hearing loss to be a medically determinable impairment (Tr. 101, 102.)  Dr. Torello also found postural and environmental limitations, including that Ms. Curran could never climb ladders, ropes, or scaffolds due to her history of seizures, and would need to avoid all exposure to hazards due to her history of seizures and eye problems.  (Tr. 104-05.)  As further explanation for the environmental limitation, Dr. Torello stated that there was "[n]o evidence of any hearing loss and still interacts without difficulty."  (Tr. 105.)

## C. Social Security Administration Disability and Function Reports

In a September 7, 2018 "Disability Report – Adult," Ms. Curran included hearing loss in both ears on the list of conditions that she alleged limited her ability to work.  (Tr. 197.)   She reported that she was scheduled to see Dr. Lanning at Ashtabula County Community Action on September 12, 2018, for her hearing issues.  (Tr. 200.)  She also reported receiving testing and being examined for her hearing issues from January 2011 through August 2018 by John M. Brace, D.O., noting she had a hearing test in August 2018.  (*Id*.)

In a September 7, 2018 "Disability Report – Field Office," the field office interviewer noted that Ms. Curran had difficulty with hearing, concentrating, and answering during the interview that the was conducted via telephone.  (Tr. 207.)  The interviewer further noted that the interview took place while Ms. Curran was at an appointment with her case worker and "[s]he was hard to understand at times due to use of speaker phone and she seemed to have trouble hearing / understanding [the interviewer]."  (Tr. 207.)

In an October 2018 "Function Report – Adult," Ms. Curran reported that her medical conditions affected her ability to hear, concentrate, and understand.  (Tr. 224.)  She also reported that she used hearing aids all the time.  (Tr. 225.)

**D.      December 6, 2019, Administrative Hearing**

**1.      Plaintiff's Counsel's Arguments**

At the December 6, 2019, hearing, Ms. Curran's counsel made various arguments relating to Ms. Curran's alleged hearing loss.  As part of his opening statements, he argued:

> We have a few issues with the way the state agency considered the claim.  First off, she has had hearing loss bilaterally since birth.  This was mentioned in the initial application when she was previously awarded benefits.  It was found to be a severe impairment.  It was not found to be either severe or non-severe at the initial reconsideration level.  I do not know why they did not even consider it.  We do have audiograms from 2011 and 2018.
>
> The 2018 audiogram does show increased hearing loss over that eight-year period in both years.  That's at 7F, page 17.  She does require hearing aids.  We'd argue that a limitation to a quiet work environment would be appropriate based on that bilateral hearing loss.

(Tr. 40-41.)   He also noted that he planned to ask the Vocational Expert about the hearing loss issues.  (Tr. 41.)   In closing remarks, he stated:

> She's been very consistent that she hasn't been able to hear from the beginning.  The last decision in 2012 that was favorable on a different, on a different basis she met the seizure requirement at that point for the listing, did find the hearing impairment to be severe.  She listed it as the very top thing in her application as why she's applying.  And they didn't even consider it.  So I'd ask the court to consider and go with the hypothetical number 4 requiring a quiet noise environment so she could actually communicate one-on-one with individuals and hear people and not be subject to a bunch of background noise.

(Tr. 67.)

**2.      Plaintiff's Testimony**

Ms. Curran testified in response to questioning by the ALJ and her representative.  (Tr. 42-62.)   During the hearing, she requested that questions be repeated on more than one occasion.

8

(*See e.g.*, Tr. 43 ("Hmm.  What?"); Tr. 43 (I'm sorry.  I can't hear you.  What are you saying?"); Tr. 44 ("Hmm?"); Tr. 68 ("Can you repeat what you just said?" (stating that she felt like the ALJ was "speaking kind of fast").)

Ms. Curran explained that she did not drive and did not have a driver's license because of her seizure disorders.  (Tr. 44-45.)   She testified that as a child she went to the "Crippled Children's Society" because she was born deaf.  (Tr. 58.)  She relayed that she had a teacher there who taught her how to sign and she learned to watch other people's movements and facial expressions and read lips.  (*Id*.)  She noted however that it was hard to watch people sign because of her vision problems.  (*Id*.)  She relayed that she received the hearing aids she was wearing at the beginning of that year.  (Tr. 59.)  She reported that even with use of hearing aids she would not be able to understand what was being said if there were several people around her talking. (*Id*.)  She reported being let go from at least two jobs because of problems hearing, explaining that because she was unable to hear what supervisors told her to do, she would end up doing something different from what her supervisors instructed her to do.  (Tr. 59-60.)   She also reported being let go from two other jobs due to her seizures.  (Tr. 59.)

### 3.  Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  (Tr. 62-67.)  After first noting that she had determined that Ms. Curran had no past relevant work during the relevant period, the ALJ asked the VE whether there would be work available for an individual described in the below hypothetical:

> [A]n individual of the claimant's age, education and work experience.  And if you can please assume that this hypothetical individual can never climb ladders, ropes and scaffolds, should never be exposed to hazards such as unprotected heights, dangerous machinery and commercial driving. Okay.  And this individual is further limited by being able to perform only simple routine tasks, having frequent interaction with the public and is limited to routine workplace changes.

9

(Tr. 63-64.) In response, the VE testified that the following unskilled, light exertional level jobs would be available: garment sorter, classifier, and bagger. (Tr. 64.) Ms. Curran's counsel then asked the VE whether the identified jobs would still be available if the described individual was also limited to a quiet noise environment consistent with noise intensity level 2. (Tr. 65.) In response, the VE indicated that the identified jobs would be eliminated because they involved moderate noise and there would be no other jobs available. (Tr. 65-66.)

### III. Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

Furthermore:

[A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1.     If the claimant is doing substantial gainful activity, he is not disabled.

2.     If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920;  *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In her January 28, 2020, decision, the ALJ noted her obligations under *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997), *Dennard v. Sec'y of Health & Hum. Servs.*, 907 F.2d 598 (6th Cir. 1990), and Acquiescence Rulings 98-3(6) and 98-4(6) to follow findings of a prior Administrative Law Judge absent new and material evidence showing improvement in a claimant's condition.  (Tr. 19-20.)   The ALJ then stated "I find that there has been new and material evidence has become available since April 2, 2012.  Therefore, *Drummond* and *Dennard* do not apply."  (Tr. 20.)  The ALJ proceeded to make the following findings:[2]

---

[2] The ALJ's findings are summarized.

1.    The claimant has not engaged in substantial gainful activity since August 10, 2018, the application date.  (Tr. 22.)

2.    The claimant has the following severe impairments: loss of visual activity, epilepsy, anxiety disorder, depressive disorder, and post-traumatic stress disorder.  (*Id*.)  The claimant's hearing loss and ACL tear of the left knee are non-severe impairments.  (*Id*.)

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments.  (Tr. 22-24.)

4.    The claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: claimant can never climb ladders, ropes, or scaffolds; never be exposed to hazards such as unprotected heights, dangerous moving machinery or commercial driving; limited to performing simple, routine tasks; frequently interact with the public; and limited to routine workplace changes.  (Tr. 24-26.)

5.    The claimant has no past relevant work.  (Tr. 26.)

6.    The claimant was born in 1981 and was 37 years old, defined as a younger individual age 18-49, on the date the application was filed.  (*Id*.)

7.    The claimant has at least a high school education and can communicate in English.  (*Id*.)

8.    Transferability of job skills is not an issue.  (*Id*.)

9.    Considering the claimant's age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including garment sorter, classifier, and bagger, garment industry.  (Tr. 26-27.)

Based on the foregoing, the ALJ found Ms. Curran had not been under a disability as defined in the Social Security Act from August 10, 2018 through the date of the decision.  (Tr. 27.)

## V. Plaintiff's Arguments

Ms. Curran argues that the Commissioner's final decision is not supported substantial evidence because the ALJ erred in her consideration of Ms. Curran's hearing loss, as follows: (1) the ALJ's finding at Step Two that her bilateral hearing loss was not a severe impairment is

not supported by substantial evidence in light of a prior ALJ's finding that the impairment was severe (ECF Doc. 18 pp. 1, 18-19; ECF Doc. 23 pp. 5-6);  (2) the ALJ's RFC finding fails to account for her severe bilateral hearing loss (ECF Doc. 18 pp. 1, 10-14; ECF Doc. 23 pp. 1-4); and (3) the ALJ's evaluation of her subjective allegations regarding hearing loss did not comply with SSR 16-3p (ECF Doc. 18 pp. 1, 14-18; ECF Doc. 23 p. 5).

## VI. Law & Analysis

### A.      Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r Of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)); *see also Blakley*, 581 F.3d at 406.  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

"'The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'"  *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Blakley*, 581 F.3d at 406 ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'") (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Even where an ALJ decision is supported by substantial evidence, the Sixth Circuit explains the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007); citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–547 (6th Cir. 2004)); *see also Rabbers*, 582 F.3d at 654 ("Generally, … we review decisions of administrative agencies for harmless error.").   A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.    First Assignment of Error: Whether ALJ Erred in Finding Bilateral Hearing Loss Was a Non-Severe Impairment at Step Two**

Ms. Curran asserts that the ALJ's Step Two finding that her bilateral hearing loss was not a severe impairment is not supported by substantial evidence because a prior ALJ concluded that hearing loss was a severe impairment, and there was no evidence of significant improvement in her ability to hear.  (ECF Doc. 18 pp. 18-19; ECF Doc. 23 pp. 5-6.)  Thus, she argues that the Sixth Circuit's finding in *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837, 839 (6th Cir. 1997) dictates a finding that the ALJ erred in finding her hearing loss to be a non-severe impairment. (*Id.*)  The Commissioner acknowledges that "Plaintiff has decreased hearing in both ears," but argues that any failure to find hearing loss to be a severe impairment at Step Two was harmless error because the ALJ found other severe impairments and reasonably evaluated the combined effects of Ms. Curran's impairments, including hearing loss, on her ability to work.  (ECF Doc. 21 pp. 5-6, 11.)  The Commissioner also argues that remand is not required under *Drummond* because the prior ALJ decided the case at Step Three without formulating an RFC, meaning that the RFC in this case does not differ from a prior RFC finding.  (*Id.* at p. 7.)

**1.    Whether ALJ Erred in Step Two Analysis of Bilateral Hearing Loss**

A claimant bears the burden of showing the severity of her impairments.  *Foster v. Sec'y of Health & Human Svcs.,* 899 F.2d 1221, at *2 (6th Cir. 1990) (unpublished table decision) (citing *Murphy v. Sec'y of Health & Human Svcs.*, 801 F.2d 182, 185 (6th Cir. 1986).  A "severe" impairment is defined under the regulations as "any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities."  *Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 428 (6th Cir. 2007) (quoting 20 C.F.R. § 404.1520(c)); *see also Long v. Apfel*, 1 F. App'x 326, 330–32 (6th Cir. 2001).  Being able to do basic work activities, means having "the abilities and aptitudes necessary to do most

jobs." 20 C.F.R. § 404.1522(b).  Examples include: "(1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with changes in a routine work setting."  *Id.*

The Sixth Circuit has construed Step Two as a *de minimis* hurdle, explaining that "an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience."  *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988).  "The goal of the test is to 'screen out totally groundless claims.'" *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) (*quoting Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir.1985)).

In situations where an ALJ has identified both severe and non-severe impairments, the Sixth Circuit has sometimes held that an ALJ decision finding some impairments non-severe was harmless error because the Commissioner could still consider the non-severe impairments in assessing the RFC.  *See Maziarz v. Sec'y of Health & Hum. Servs.*, 837 F.2d 240, 244 (6th Cir. 1987); *see also Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) (finding it "legally irrelevant" that some impairments were not deemed severe where the designation of other impairments as severe "cleared step two of the analysis" and thus caused the ALJ to consider both "severe and nonsevere impairments in the remaining steps of the sequential analysis"); *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003) (finding "the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence" when ALJ found a severe impairment at step two).

However, this harmless error standard is not applicable where an ALJ has failed to consider the non-severe impairments in assessing the RFC.  *See Simpson v. Comm'r of Soc. Sec.,* 344 F. App'x 181, 190-191 (6th Cir. 2009) (distinguishing *Maziarz* and finding reversible error when an ALJ found that plaintiff's non-severe mental impairments "would not be considered in assessing her RFC"); *Dudley v. Comm'r of Soc. Sec.,* No. 2:16-CV-0682, 2017 WL 2374432, at *4 (S.D. Ohio June 1, 2017) (finding harmless error did not apply to finding mental impairments non-severe when ALJ "did not take any mental impairments or limitations into account" in the RFC), *report and recommendation adopted*, No. 2:16-CV-682, 2017 WL 2645962 (S.D. Ohio June 20, 2017); *Rose v. Comm'r of Soc. Sec.*, No. 2:14-CV-1901, 2015 WL 6735313, at *5 (S.D. Ohio Nov. 4, 2015) (finding harmless error analysis "is appropriate only when the ALJ properly considered any functional limitations arising from non-severe impairments when crafting his residual functional capacity finding"), *report and recommendation adopted*, No. 2:14-CV-1901, 2015 WL 7779300 (S.D. Ohio Dec. 2, 2015); *see also Pompa*, 73 F. App'x at 803 (applying harmless error standard where "ALJ considered all of [plaintiff]'s impairments in her residual functional capacity assessment finding").

Here, the ALJ found at Step Two that Ms. Curran's hearing loss was a non-severe impairment.  (Tr. 22.)  She explained that Ms. Curran "was noted as having hearing loss at birth, and had a history of ear drum repair tubes," but concluded that her hearing loss did not appear to cause "more than minimal limitations in the claimant's ability to engage in basic work-related activities."  (*Id.* (citing Tr. 279, 1198).)  Lacking from this Step Two analysis, however, was any finding that Ms. Curran's non-severe hearing loss was considered, either alone or in combination with other impairments, in developing the RFC.  (*Id.*)  Likewise, the ALJ did not indicate in her Step Four analysis that she considered limitations relating to Ms. Curran's non-severe hearing

loss in developing the RFC.  (Tr. 24-26.)  Moreover, in articulating the bases for the RFC limitations, the ALJ explicitly linked each limitation with specific severe impairments, finding that Ms. Curran's visual impairments and seizures supported limitations on hazards, that her seizures also supported limitations on climbing, and that her mental health impairments supported specified mental limitations.  (Tr. 25.)  Because the ALJ's decision does not reflect that she considered hearing loss in developing the RFC, a harmless error standard does not apply.

The next question is whether the ALJ's finding that Ms. Curran's hearing loss was non-severe was supported by substantial evidence.  A review of the medical record as a whole reveals that the ALJ's cursory discussion of this impairment failed to adequately address evidence suggestive of more than minimal limitations, and thus failed to "build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877.

In her single-sentence discussion of the medical evidence, the ALJ noted only a history of hearing loss at birth and past ear drum repairs.  (Tr. 22.)  In support of this finding, she cited to: (1) a June 15, 2012 letter from Dr. Muthusamy noting a "history of hearing loss at birth" and history for "ear drum repair tubes in her ears" (Tr. 279); and (2) an audiology test report from October 19, 2018, showing hearing testing while using hearing aids (Tr. 1198).  The ALJ did not address other audiogram findings from 2011 that suggested moderate hearing loss (Tr. 759 (SRT 40 in right ear; SRT 45 in left ear), 761 (SRT 45 bilaterally)), cranial nerve testing from 2012 that revealed decreased hearing (Tr. 280, 287), or audiogram findings from 2018 that suggested moderately severe hearing loss (Tr. 757 (SRT 65 bilaterally)).  While the ALJ did cite to more recent audiology results that suggested reduced limitations when wearing hearing aids, with a recorded SRT of 25 and word discrimination at 92% (Tr. 1198), she did not specifically discuss those objective findings or their significance to her determinations regarding Ms. Curran's

limitations.  It is noted that the relevant examination notes indicated that adjustments were made "to better assist re clarity" and instructed Ms. Curran to return in two weeks.  (*Id.*)

It is also noted that the administrative record contains additional observational evidence suggestive of limitations due to hearing loss.  At a telephonic meeting with Social Security field office personnel, it was specifically observed that Ms. Curran had difficulty with "hearing" and "answering," and "seemed to have trouble hearing/understanding [the interviewer]."  (Tr. 207.) Additionally, while the hearing transcript reflects that Ms. Curran was able to interact with her counsel and the ALJ, it also documents that she asked on more than one occasion for questions or statements being repeated.  (*See e.g.*, Tr. 43 ("Hmm.  What?") ("I'm sorry.  I can't hear you. What are you saying?"); Tr. 44 ("Hmm?"); Tr. 68 ("Can you repeat what you just said?") (stating she felt like the ALJ was "speaking kind of fast").)

Ultimately, the undersigned finds that the ALJ's mention of hearing loss and citation to a single audiogram – without discussing the results of that testing or any conclusions drawn from those results – is insufficient to build an accurate and logical bridge between the evidence and the Step Two finding that Ms. Curran's hearing loss was non-severe, when considered in the context of her failure to address other objective and observational evidence of limitation, and her failure to address whether (and how) hearing loss was considered in developing the RFC.

Accordingly, the undersigned finds that the ALJ erred at Step Two of the sequential analysis, and recommends that the Court remand this matter so that the ALJ may further consider and articulate her Step Two findings with respect to Ms. Curran's bilateral hearing loss.

### 2.    Whether Res Judicata is Implicated in ALJ's Step Two Findings

As noted above, Ms. Curran has asserted under the *Drummond* standard that res judicata principles require a finding of error at Step Two.  The undersigned does not find that current

Sixth Circuit precedent supports the relief sought by Ms. Curran in this case.  While a thorough analysis of the issue is unnecessary in light of the finding of error in Section VI.B.1., *supra*, the applicable standards will nevertheless be briefly addressed herein.

In *Drummond*, the Sixth Circuit cited to "the principles of res judicata" in holding: "Absent evidence of an improvement in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ."  126 F.3d at 841-42.  In a related Acquiescence Ruling, the Social Security Administration ("SSA") applied *Drummond* to disability findings as follows:

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method of arriving at the finding.

AR 98-4(6), 63 Fed. Reg. 29771, 29773 (June 1, 1998).

More recently, in *Earley v. Commissioner*, the Sixth Circuit reexamined *Drummond* and its reliance on principles of res judicata, and observed: "Unusual facts, it seems to us, led to some overstatement in *Drummond* but not to an incorrect outcome."  893 F.3d 929, 933 (6th Cir. 2018).  While the standard in *Drummond* was based on res judicata principles, the *Earley* Court clarified that "res judicata only 'foreclose[s] successive litigation of the very same claim,'" while "'a claim that one became disabled in 1990 is not the same as a claim that one became disabled in 1994.'"  *Id.* (citations omitted).  This fact, argued the Sixth Circuit, "helps to explain why *Drummond* referred to 'principles of res judicata' – with an accent on the word 'principles.'"  *Id.* (citing 126 F.3d at 841–43).  In other words, the *Earley* Court held that res judicata is not truly the standard at issue when a claimant seeks benefits for a new period of disability.

20

In clarifying the applicable standard, the *Earley* Court noted that the Fourth Circuit had "faced a problem almost identical to the one [the Sixth Circuit] face[s] – the need to correct an overreading of a prior decision with respect to this exact issue." *Id.* Then, mirroring the Fourth Circuit's approach to the issue, the Sixth Circuit indicated *Drummond*'s holding was not actually an issue of "preclusion," but was instead "'best understood as a practical illustration of the substantial evidence rule' in which the prior factual finding was 'such an important and probative fact as to render the subsequent finding to the contrary unsupported by substantial evidence.'" *Id.* at 934 (citing *Albright v. Comm'r of Soc. Sec. Admin.*, 174 F.3d 473, 476–77 (4th Cir. 1999)).

In articulating the Sixth Circuit standard going forward, the *Earley* Court explained: "Fresh review is not blind review. A later administrative law judge may consider what an earlier judge did if for no other reason than to strive for consistent decision making." *Id.* at 934. The Court went on to observe that "our current description of the standard is no different in the main from what any other circuit is doing today." *Id.* Thus, the Sixth Circuit clarified that an ALJ may certainly consider the findings of a prior ALJ decision, and indeed that such findings can sometimes be "important and probative" to a substantial evidence analysis, but that the prior ALJ findings are not *per se* binding on a subsequent ALJ under a res judicata standard.

In light of both the procedural background in this case and the clarification of applicable Sixth Circuit law in *Earley*, the undersigned does not find Ms. Curran's argument for relief under *Drummond* to be convincing. Several considerations are relevant to this conclusion. First, unlike *Drummond*, the underlying ALJ decision in this case was not a prior denial of benefits; rather, it was a favorable decision under Listing 11.02. (Tr. 77.) While the decision did include a finding that "hearing loss" was a severe impairment, the decision did not include any findings regarding related limitations, and the findings regarding hearing loss were for the most part

21

incidental to the ALJ's findings with respect to disability. (Tr. 76.) Second, also unlike *Drummond*, the prior ALJ decision referenced by Ms. Curran was not the most recent finding with regard to her disability status. On the contrary, the record reflects (albeit peripherally) that a continuing disability review ("CDR") in or around 2015 concluded that Ms. Curran was no longer entitled to disability benefits. (Tr. 81, 85, 206.) That finding was not apparently appealed to the hearing level. (*Id.*) Thus, the record suggests medical improvement before the present case was filed, when the SSA made a final decision terminating Ms. Curran's benefits in or around 2015. And third, the Sixth Circuit in *Earley* has clarified that ALJs "may consider what an earlier judge did" and should "strive for consistent decision making," but corrected the "overstatement" in *Drummond* which suggested that prior ALJ decisions hold a binding res judicata effect on future decisionmakers. 893 F.3d at 933-34.

As the *Earley* court explained, the required analysis is a "substantial evidence" standard. As articulated in Section VI.B.1., *supra*, the medical and administrative records in this case support a conclusion that the ALJ failed to build an accurate and logical bridge between the evidence and her Step Two finding that Ms. Curran's hearing loss was non-severe. The fact that a prior ALJ concluded that Ms. Curran's hearing loss was "severe" – in a decision that granted benefits on an unrelated basis, and was followed by a subsequent final determination of non-disability – is certainly a factor that may be considered as part of a substantial evidence analysis. But the undersigned does not find that an application of the *Drummond* standard alone is supportive of a finding of error at Step Two in this case.

**C.** **Second Assignment of Error: Whether RFC Lacked Support of Substantial Evidence Because It Failed to Account for Bilateral Hearing Loss**

Ms. Curran also argues that the ALJ's RFC was not supported by substantial evidence, given the ALJ's lack of discussion of her hearing loss at Steps Three through Five. (*Id.* at pp.

22

10-14.)   The Commissioner responds that "whether severe or not, Plaintiff failed to prove the hearing loss caused additional limitations on her ability to work," such that any failure to address Ms. Curran's hearing loss in the analysis of her RFC was harmless.  (ECF Doc. 21 pp. 9-12.) For the reasons discussed in Section VI.B.1., *supra*, the undersigned finds that the ALJ failed to create a logical bridge between the evidence and her decision not to discuss or consider the impact of Ms. Curran's hearing loss on the RFC, such that the failure to account for the impact of hearing loss on the RFC amounted to harmful error.

The Commissioner further argues that any error regarding the RFC limitations is harmless because "there are limitations within the RFC that can account for hearing loss," such as limitations on exposure to hazards and on interaction with the public.  (ECF Doc. 21 p. 9.) This suggestion that is without record support, given that the ALJ explicitly stated that the hazard limitations were added based on Ms. Curran's seizure disorder and visual impairment, and that the interaction limitations were added based on her mental health impairments.  (Tr. 25.)  The recommended inference that these RFC limitations were intended to address hearing loss, contrary to the clear statements of the ALJ in her decision, amount to improper *post hoc* rationalizations.  *See Simpson v. Comm'r of Soc. Sec.*, 344 Fed. App'x 181, 192 (6th Cir. 2009) (finding a reviewing court must assess the propriety of the administrative agency's action on the grounds invoked by the agency) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).  The ALJ's decision itself, not after-the-fact arguments by the Commissioner, must provide adequate and sufficient analysis to "build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877.

The same finding is required with respect to the Commissioner's remaining argument for harmless error.  After discussing the DOT requirements for the three jobs identified by the VE,

the Commissioner notes that the jobs did not require talking or hearing, and could be performed in environments limited to moderate noise.  (ECF Doc. 21 p. 10.)  This argument supports only a finding that the ALJ could have added hearing-related limitations to the RFC that did not preclude performance of the same three jobs identified by the VE.  But the fact is, the ALJ failed to add hearing-related limitations to the RFC, and additionally failed to discuss the evidence relevant to the determination of what (if any) hearing-related limitations Ms. Curran would require in a work setting.  Because the ALJ failed to address hearing-related limitations in her decision, the Court will not make unsupported inferences as to what limitations the ALJ might have imposed.

For all of the reasons discussed herein, the undersigned finds that the ALJ committed harmful error in failing to explicitly address the impact of Ms. Curran's hearing loss on her RFC.

### D.    Third Assignment of Error: Whether ALJ Failed to Comply with SSR 16-3p in Evaluating Subjective Allegations Regarding Hearing Loss

Ms. Curran also argues that the ALJ's decision is not supported by substantial evidence because she did not discuss hearing loss when assessing whether Ms. Curran's subjective allegations were consistent with the evidence.  (*Id*. at pp. 14-17.)  The Commissioner responds that the subjective symptom evaluation was supported by substantial evidence even though the ALJ did not "explicitly cite to Plaintiff's alleged hearing loss later in the brief."  (*Id*. at pp. 7-9.)

"[A]n ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003); *see also Alexander v. Kijakazi*, No. 1:20-cv-1549, 2021 WL 4459700, at *13 (N.D. Ohio Sept. 29, 2021) ("An ALJ is not required to accept a claimant's subjective complaints.") (citing *Jones*, 336 F.3d at 476); *see also* 20 C.F.R. § 416.929(a) and SSR 16-3p, 81 Fed. Reg. 14166 (March 16, 2016) (republished as 82 Fed Reg. 49462 (Oct. 25, 2017) as to applicable date and to update citations to reflect revisions to

regulations effective March 27, 2017)) (explaining that a claimant's statements of symptoms alone are not sufficient to establish the existence of a physical or mental impairment or disability).  While "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference. . ., an ALJ's assessment of a claimant's credibility must be supported by substantial evidence."  *Calvin v. Comm'r of Soc. Sec.*, 437 F. App'x 370, 371 (6th Cir. 2011) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).)

SSR 16-3p rescinded and supersedes SSR 96-7p and eliminated "the use of the term 'credibility' from [the SSA's] sub-regulatory policy," because, as the SSA explained, the "regulations do not use this term."  SSR 16-3p, 82 Fed Reg. 49462, 49463.  The revised regulations clarify "that subjective symptom evaluation is not an examination of an individual's character."  *Id.*  Rather, when determining "whether an individual's symptoms will reduce his or her corresponding capacities to perform work-related activities . . . the *consistency* of the individual's own statements" is considered.  *Id.* at 49466 (emphasis added); *see also Banks v. Comm'r of Soc. Sec.*, No. 2:18-cv-38, 2018 WL 6060449, *5 (S.D. Ohio Nov. 20, 2018) ("SSR 16-3p requires the ALJ to evaluate the consistency of a plaintiff's statements, without reaching the question of overall credibility, or character for truthfulness.") (citing SSR 16-3p), *report and recommendation adopted*, 2019 WL 187914 (S.D. Ohio Jan. 14, 2019).

Under the two-step process used to assess the limiting effects of a claimant's symptoms, a determination is first made as to whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms.  SSR 16-3p, 82 Fed Reg. 49462, 49463; *Rogers v. Comm'r Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a))*.*  If that requirement is met, the second step is to evaluate of the intensity and persistence of the claimant's symptoms to determine the extent to

which they limit the claimant's ability to perform work-related activities.  SSR 16-3p, 82 Fed

Reg. 49462, 49463; *Rogers,* 486 F.3d at 247.  In undertaking this analysis, an ALJ considers

objective medical evidence, a claimant's subjective complaints, information about a claimant's

prior work record, and information from medical and non-medical sources.  SSR 16-3p, 82 Fed

Reg. 49462, 49464-49466; 20 C.F.R. § 416.929(c)(3).  Factors relevant to a claimant's

symptoms such as pain include daily activities, types and effectiveness of medications, treatment

received to address symptoms, and other factors concerning a claimant's functional limitations

and restrictions due to pain or other symptoms.  SSR 16-3p, 82 Fed Reg. 49462, 49465-49466;

20 C.F.R. § 416.929(c)(3).

Here, the Commissioner argues that the ALJ's assessment of Ms. Curran's subjective

allegations was supported by substantial evidence because "the record as a whole does not

indicate her condition was of disabling severity."  (ECF Doc. 21 p. 8.)  More specifically, she

points to medical records suggesting Ms. Curran was able to communicate and interact with her

medical providers, and a hearing transcript demonstrating that she actively participated in her

disability hearing.  (*Id.* (citing records).)   She also argues that there is no objective evidence to

document the functional impact of the audiological evidence.  (*Id.*)

As a general matter, the undersigned observes that there does appear to be both evidence

that could be supportive of a more significant level of limitation, and evidence that is potentially

suggestive of less significant limitations.  For example, the hearing transcript suggests Ms. Curran

was able to understand and participate in her disability hearing, but also documents that she

periodically asked for questions or statements to be repeated.  (Tr. 43, 44, 68.)  Likewise, while

some objective evidence suggests some level of hearing impairment, other objective evidence

may be suggestive of limited to no hearing impairment.  (*Compare* Tr. 280, 287, 749, 757, 761,

1198, 1627 *with* Tr. 378, 380, 1600, 1784.)  There is also evidence suggesting some improvement with the use of hearing aids, but other evidence suggesting limited use of hearing aids.  (*Compare* Tr. 1198 *with* Tr. 1600, 1782.)

Ultimately, it is not the role of this Court to weigh the evidence and ascertain Ms. Curran's level of limitation with respect to her hearing impairment.  That is the role of the ALJ. In this case, the ALJ erred in both her cursory discussion of the evidence relevant to Ms. Curran's hearing impairment, and in her failure to identify any basis for not giving credence to Ms. Curran's subjective complaints regarding her hearing loss.  The Commissioner's attempts to create a *post hoc* rationale by discussing evidence that was not addressed by the ALJ must fail.

For the reasons explained herein, the undersigned finds that the ALJ has not built an accurate and logical bridge between the evidence and her implicit finding that Ms. Curran's subjective complaints regarding hearing loss were not consistent with the record as a whole.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the Court **VACATE and REMAND** the Commissioner's decision for further analysis of Ms. Curran's hearing loss and any work-related limitations caused by that impairment.

February 16, 2022                          */s/ Amanda M. Knapp*
                                           AMANDA M. KNAPP
                                           UNITED STATES MAGISTRATE JUDGE


## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).